# THE INTERFACE GROUP & another[1] *vs.* COMMISSIONER OF REVENUE.

No. 06-P-1875.

Suffolk. November 14, 2007. - June 13, 2008.

Present: KAFKER, SMITH, & KATZMANN, JJ.

*Taxation,* Appellate Tax Board: appeal to Appeals Court, Abatement. *Administrative Law,* Agency's interpretation of regulation.

This court vacated a decision of the Appellate Tax Board (board) denying the applications of the plaintiffs (a Massachusetts business trust and a non-resident shareholder) for a tax abatement relating to the plaintiff business trust's wholly owned subsidiary, which sold travel packages both within and outside Massachusetts, where issues remained that required further explanation by the board, including its conclusory finding that there was no ground for viewing the income-producing activities in question on a transactional basis, despite an interpretation of the relevant regulations that might have been consistent with a transactional approach. [35-41]

APPEAL from a decision of the Appellate Tax Board.

*Maxwell D. Solet* (*Paul G. Roberts & A.W. Phinney* with him) for the taxpayers.

*Jeffrey S. Ogilvie* for Commissioner of Revenue.

KATZMANN, J. This is an appeal from a decision of the Appellate Tax Board (board) affirming the denial by the Commissioner of Revenue (Commissioner) of applications by the taxpayers, The Interface Group (Interface) and Sheldon G. Adelson (Adelson), for the abatement of taxes relating to the sale of travel packages. The taxpayers contend that the board erred in applying the corporate excise sales factor, see G. L. c. 63, § 38(*c*) & (*f*), when it found that Interface's over-all business operation constituted its "income-producing activity" under 830 Code Mass.

---

[1]Sheldon G. Adelson.

Regs. § 63.38.1(9)(d)(2) (1999).[2] This error, according to the taxpayers, led the board to erroneously rule that one hundred per cent of the revenue Interface received from the sale of travel packages was properly apportioned to Massachusetts. We remand this matter for further proceedings.

*Background.* 1. *The parties.* Interface is a Massachusetts business trust whose business operations are conducted by a wholly-owned subsidiary, Interface Group-Massachusetts, LLC (the LLC). The LLC is the successor to Interface Group-Massachusetts, Inc. (the S corporation), which operated a public charter tour operation during the tax years at issue under the trade names GWV Travel and GWV International. Interface does not dispute that it is the legal successor to tax claims arising during this period.

Adelson was the majority shareholder of Interface and the S corporation during the tax years at issue. Adelson does not dispute the board's conclusion that as a nonresident shareholder he was subject to tax on the income he received from Interface to the extent it was attributable to the business Interface conducted in Massachusetts.[3]

2. *Procedural history.* After auditing Interface's returns for 1991, 1992, 1993, 1994, and 1995, the Commissioner issued notices of intention to assess, followed by notices of assessment for those years. Interface paid the additional assessment and subsequently sought abatement. Interface also sought a similar abatement for tax years 1998, 1999, and 2000. The Commissioner denied the applications for abatement. Interface subsequently filed a petition with the board challenging that denial.

The Commissioner issued Adelson a notice of intention to assess additional income tax for the years 1994 and 1995 based

[2]The parties appear to agree that the regulations at issue in the instant appeal, 830 Code Mass. Regs. § 63.38.1(9)(d)(1) and (2), were promulgated in 1999. We note that the Commissioner originally promulgated these regulation in 1995, see *Boston Professional Hockey Assn.* v. *Commissioner of Rev.*, 443 Mass. 276, 280 & n.8 (2005), and that the excerpts of those regulations quoted herein are the same in both the 1995 and the 1999 promulgations.

[3]As the propriety of the denial of Adelson's applications for abatement depends upon the propriety of the denial of Interface's applications for abatement, we reject the board's assertion that the taxpayers' brief failed to present adequate appellate argument for considering Adelson's appeal. See *Leardi* v. *Brown*, 394 Mass. 151, 164 n.12 (1985).

on Adelson's income from Interface. Adelson timely filed applications for abatement for 1994 and 1995 and an application to amend and abate his 1998 return. The Commissioner denied Adelson's applications. Adelson filed a petition with the board challenging that denial.

The petitions filed by Interface and Adelson challenging the Commissioner's denial of their applications for abatement were consolidated for hearing by the board. The board affirmed the Commissioner's denial of the abatement applications.[4]

3. *The board's findings.* In its written decision denying the taxpayers' applications for abatement, the board made the following findings of fact.

During the relevant tax years, Interface operated a public charter tour company under the trade names GWV Travel and GWV International (collectively, GWV). GWV created and marketed travel packages in bulk to various travel destinations, outside Massachusetts, in overseas territories of the United States and in foreign countries. The travel packages were sold one at a time, through travel agents who were independent of GWV, to individual customers. All travel packages included air transportation, hotel accommodations, and ground transfers.

GWV representatives contracted with air carriers and airlines, hotels, and ground transportation operators to create the travel packages. Most of those vendors were located outside Massachusetts. To create the packages, GWV representatives often needed to travel outside Massachusetts to negotiate and execute bulk contracts. GWV did not own or manage any of the airlines, hotels, or ground transportation providers supplying the separate components of the travel packages. GWV had employees, or contracted with independent representatives, to meet arriving passengers and to provide destination-based client services. In assembling trips, GWV recorded, as its own costs, outlays for airfare, ground transportation, hotel accommodations, penalties for unused hotel rooms, passenger facility charges, general usage charges, departure taxes, security fees, foreign entry fees, immigration fees, airport service charges, and other similar taxes or

---

[4]The total amount of corporate excise at issue for Interface is $762,501, plus interest, and a penalty fee of $10,936 for tax year 1995. The total amount of income tax at issue for Adelson is $268,498, plus interest.

duties. In its tour participation agreement, which GWV required each customer to sign, GWV disclaimed liability for actions and omissions by third party contractors.

GWV set the prices for the packages. As noted, GWV travel packages were sold to customers through independent travel agents. When a travel agent sold a travel package to a consumer, the agent took a deposit from the consumer and either forwarded the deposit to GWV — GWV then paid the agent a commission — or deducted from the deposit a commission and forwarded the balance. All customer funds received by GWV were placed in escrow pending the completion of the vacation. GWV accounted for the sale of each travel package as a separate transaction for each individual customer. The tour participant agreement provided that each travel package created an obligation of a particular customer to pay a specific consideration to GWV.

The "vast majority" of GWV's employees were based in GWV's Needham office. These Massachusetts-based employees acted as liaisons with the destination hotels, providing the hotels with room counts and guest names; responded to special requests; coordinated GWV's marketing by developing seasonal brochures and promotional flyers for distribution to travel agents and advertising media; and assembled the various travel packages. For each tax year at issue, over ninety per cent of GWV's payroll was paid to workers operating in Massachusetts.

According to internal accounting documents in evidence (which list the cost components by destination), the costs for hotel accommodations, airfare, and ground transportation accounted for approximately ninety per cent of GWV's direct costs for providing each travel package.[5] However, in analyzing GWV's total costs on a yearly basis rather than a per-transaction basis, the costs allocated to Massachusetts, including overhead and personnel costs, were greater than the costs allocated to any single destination, even when the costs for airfare, hotel accommodations, and ground transportation were included in GWV's costs of performance and apportioned to the destination locations.[6]

*Discussion.* At issue in this case is Interface's Massachusetts-

---

[5]On this point, the board accepted the testimony of David Bloom, the comptroller and chief financial officer of GWV.

[6]The board found that Bloom conceded this in his testimony.

attributable sales. When a corporation conducts business both within and outside the Commonwealth, "the share of its taxable net income subject to corporate excise tax in Massachusetts is calculated by utilizing the so-called 'statutory method' provided in G. L. c. 63, § 38." *Boston Professional Hockey Assn.* v. *Commissioner of Rev.*, 443 Mass. 276, 279 (2005), quoting from *Gillette Co.* v. *Commissioner of Rev.*, 425 Mass. 670, 673 (1997). "Taxable net income is determined by taking the corporation's Federal net income, as defined in G. L. c. 63, § 30(5)(*b*), applying statutory deductions enumerated in G. L. c. 63, § 38(*a*), and multiplying the result by the three-factor apportionment formula in G. L. c. 63, § 38(*c*)." *Ibid.* The apportionment formula is a "ratio of the corporation's property, payroll, and sales in Massachusetts to its total property, payroll, and sales everywhere." *Boston Professional Hockey Assn., supra* at 279-280. It is "a fraction, the numerator of which is the property factor plus the payroll factor plus twice the sales factor, and the denominator of which is four." G. L. c. 63, § 38(*c*), as amended by St. 1975, c. 684, § 49. The property, payroll, and sales factors are also fractions. *Boston Professional Hockey Assn., supra* at 280.

In the present case, only the method for calculating the sales factor is at issue. "[T]he numerator of the sales factor 'is the total sales of the corporation in this commonwealth during the taxable year,' while the denominator 'is the total sales of the corporation everywhere during the taxable year.' " *Ibid.*, quoting from G. L. c. 63, § 38(*f*). For entities like Interface, which engaged in income-producing activities in and outside the Commonwealth, G. L. c. 63, § 38(*f*), inserted by St. 1966, c. 698, § 58, provides that "[s]ales, other than sales of tangible personal property, are in this commonwealth if: . . . (2) the income-producing activity is performed both in and outside this commonwealth and a greater proportion of this income-producing activity is performed in this commonwealth than in any other [S]tate, based on costs of performance."

The Department of Revenue's regulations detail the meaning of this provision, providing:

"Gross receipts from sales, other than sales of tangible

personal property, are attributed to Massachusetts if the income-producing activity that gave rise to the receipts was performed wholly within Massachusetts. *If income-producing activity is performed both within and without Massachusetts and if the costs of performing the income-producing activity are greater in Massachusetts than in any other one [S]tate, gross receipts are attributed to Massachusetts"* (emphasis supplied).

830 Code Mass. Regs. § 63.38.1(9)(d)(1) (1999). The regulations then define income-producing activity as:

> "a transaction, procedure, or operation directly engaged in by a taxpayer which results in a separately identifiable item of income. In general, any activity whose performance creates an obligation of a particular customer to pay a specific consideration to the taxpayer is an income-producing activity."

830 Code Mass. Regs. § 63.38.1(9)(d)(2) (1999).

In the instant case, the board rejected Interface's argument that GWV's income-producing activity was the individual sale of travel packages (transactional approach) and concluded that Interface's income-producing activity was its over-all operation (operational approach) because: (1) the board "had previously rejected a similar argument that individual hockey games should be considered separate income-producing activities in *[Boston Professional Hockey Assn.* v. *Commissioner of Rev.*, Appellate Tax Bd. No. F250820-23 (June 30, 2003)], and ruled instead that the '[hockey association's] income-producing activity was . . . the over-all ownership and operation of an NHL franchise"; and (2) the board "found no basis for fracturing GWV's business into thousands of mini-transactions on a customer-by-customer basis."

Based on its adoption of the operational approach, the board concluded that Interface had failed to sustain its burden of proving that a greater proportion of Interface's income-producing activity was performed in any single State other than Massachusetts because it found that David Bloom, GWV's comptroller and chief financial officer, had conceded this point in his testimony. Accordingly, the board determined that one hundred

per cent of GWV's sales were apportioned to Massachusetts for sales factor purposes and upheld the Commissioner's assessments against the taxpayers.

We are called on to review the board's determination of Interface's "income-producing activity" in the underlying abatement action. Accordingly, we focus on the first two sentences in 830 Code Mass. Regs. § 63.38.1(9)(d)(2) (1999), the regulation that defines income-producing activity.

A reading of that regulation yields several plausible interpretations. The taxpayers, in essence, argue that the second sentence of the regulation is a limitation on the first sentence. On this view, the taxpayers claim that the plain language of these two sentences require that two conditions be satisfied for an activity to meet the definition of "income-producing activity" — first, that it be "a transaction, procedure, or operation directly engaged in by a taxpayer which results in a separately identifiable item of income," and second, as a general matter, that the performance of that activity "creates an obligation of a particular customer to pay a specific consideration to the taxpayer."

Based on this interpretation, the taxpayers, in essence, assert that the board's conclusion that the over-all operation of GWV was the income-producing activity does not comport with the language of the regulation, the board's findings, or the evidence, as the over-all operation of GWV's business did not "create[] an obligation of a *particular customer* to pay a specific consideration" (emphasis supplied). 830 Code Mass. Regs. § 63.38.1(9)(d)(2) (1999).

The taxpayers argue that the board's finding that "GWV accounted for the sale of each vacation travel package as a separate transaction for each individual customer," and the evidence, which included the Commissioner's stipulation that the "the sale of each vacation travel package is accounted for by GWV, and recorded in its books and records as a separately identifiable transaction for each individual customer," demonstrate that the sale of each travel package constituted a "transaction . . . which result[ed] in a separately identifiable item of income . . . [and] create[d] an obligation of a particular customer to pay a specific consideration." 830 Code Mass. Regs. § 63.38.1(9)(d)(2) (1999). According to the taxpayers, adoption of the transactional ap-

proach to the income-producing activity requires that the Massachusetts costs of performance for producing a single travel package be compared with the performance costs for that package in the destination State. See 830 Code Mass. Regs. § 63.38.1(9)(d)(1) (1999).[7]

Although the taxpayers' argument may have merit, the board's conclusion — that the over-all GWV operation was the income-producing activity — is consistent with an alternative argument that the word "direct" in the first sentence of the regulation "does not refer to the customer's obligation to pay consideration to the taxpayer, [but] [r]ather . . . refers to the taxpayer's participation in some activity, indeed, 'any activity whose performance creates an obligation' in a customer to pay consideration to the taxpayer." Interface Group-Nevada, Inc. vs. Commissioner of Rev., Appellate Tax Bd. No. 182909 (May 25, 2000). It is also consistent with the interpretation that because the second sentence of the regulation begins with the words "in general," that sentence is an exemplar rather than a limitation on the reach of the first sentence. On this view, it is not necessary or appropriate to go beyond the first sentence — that here, GWV's income-producing activity was the assemblage of the packages, thus, the costs of this activity were borne largely by the operation of the business in Massachusetts. According to this view, the transactional approach should not prevail because it trivializes the Massachusetts-based work that went into assembling and marketing the tour packages to produce value.[8]

The board's opinion here does not address how the two sentences of the regulation are to be construed or why the taxpayers' construction runs counter to the regulation, nor does it reconcile the arguable conflict in the board's findings. The lack

[7]The taxpayers assert that if the transactional approach is applied, the performance costs in the destination State — hotel, ground transport, and a portion of the airfare — will always exceed the Massachusetts operational costs necessary to create the single travel package. That being so, both Interface and Adelson would be entitled to an abatement.

[8]There may be other possible interpretations. Thus, for example, on another view of the regulation, the second sentence is a limitation on the first, but the "in general" language permits a departure from the requirement in the second sentence where the proponent establishes that such a departure is justified.

of clarity is compounded, moreover, because as presently constituted, the board's reasoning is premised largely on an over-extension of *Boston Professional Hockey Assn.*, 443 Mass. at 286. The board characterized the argument that each GWV sale constituted a separate "income-producing activity" as "similar" to the argument made by the taxpayer in *Boston Professional Hockey Assn., supra* at 283-284, that each hockey game constituted an "income-producing activity." However, in that case the taxpayer did not advance the transactional approach of "income-producing activity" argued here. In any event, that case quite clearly indicates that the application of the regulation depended on the facts in issue, and, as the board here acknowledges, does not stand for the proposition that a corporation's over-all operation is, ipso facto, its "income-producing activity." See *Boston Professional Hockey Assn., supra* at 286 ("The board's finding — that [the association's] income-producing activity was the operation of an NHL franchise rather than the playing of individual games — *fits comfortably* within the text of the regulation . . ."). Here, the taxpayers contend that it is the sale of each individual travel package — that is, each individual *transaction* — rather than the over-all operation of GWV, which "fits comfortably within the text of the regulation" as the income-producing activity. *Ibid.* The board, by contrast, contends that it is the over-all operation of GWV's business — the assemblage of the packages and the costs incurred by that operation — that "fits comfortably within the text of the regulation." *Ibid.*

While our review of board decisions is generally guided by deference, see *M & T Charters, Inc.* v. *Commissioner of Rev.*, 404 Mass. 137, 140 (1989), "[t]he board's decision must state adequate reasons in support of its decision so as to permit meaningful appellate review." *Blakeley* v. *Assessors of Boston*, 391 Mass. 473, 476 (1984), and cases cited. Judicial review of an agency's interpretation and application of its regulations assumes that the findings are adequately supported, that any material conflicts in the findings are addressed, and, that where plausible competing interpretations of the regulations have been advanced, the agency has provided an explanation for reaching its conclusion from among the array of alternative views.

See *Costello* v. *Department of Pub. Util.*, 391 Mass. 527, 533 (1984).

In this case, as we have noted, the board has not reconciled the conflict in its findings. While a board's rulings may be informed by the practicalities of administration, here the board has not provided an explanation for its conclusory determination that it "found no basis for fracturing GWV's business into thousands of mini-transactions on a customer-by-customer basis." Moreover, as we have noted, although it may be that GWV's income-producing activity can be conceptualized appropriately as the bulk assembly of travel packages, it is also the case that the taxpayer has put forth an interpretation that may be consistent with a transactional approach.[9] These are all issues that require further explanation by the board. Accordingly, we vacate the decision of the board and remand the case for further proceedings consistent with this opinion.

*So ordered.*

---

[9]On remand, if the transactional approach is determined to be applicable, the parties are not foreclosed from making further argument, as may be appropriate, regarding how the assemblage of the travel packages, as a component of GWV's income-producing activity, may be considered under the transactional rubric, and whether, under the appropriate regulation, GWV's sales are properly apportioned to Massachusetts or another destination State. In that regard, Interface has the burden of proving that a greater proportion of its costs of performance with respect to each separately identifiable transaction were incurred in a State other than Massachusetts. See *Boston Professional Hockey Assn.*, 443 Mass. at 285.